**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | **Case No. 21-cr-147-1 (CKK)** |
| v. | : | |
| | : | |
| CHRISTOPHER RAPHAEL SPENCER, | : | |
| | : | |
| Defendant | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Christopher Spencer to twelve months of incarceration, one year of supervised release, and $500 in restitution.

## I.  Introduction

Defendant Christopher Spencer, age 44 and a technician for a concrete services company, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

Spencer was convicted at a stipulated trial of violations of Obstruction of an Official Proceeding, in violation of Title 18, United States Code, § 1512(c)(2) and (2); Entering and Remaining in a Restricted Building, in violation of Title 18, United States Code, § 1752(a)(1); Disorderly and Disruptive Conduct in a Restricted Building, in violation of Title 18, United States Code, § 1752(a)(2); Disorderly Conduct in a Capitol Building, in violation of Title 40, United States Code, § 5104(e)(2)(D); and Parading, Demonstrating, or Picketing in a Capitol Building, in violation of Title 40, United States Code, § 5104(e)(2)(G).[2] The government's recommendation is supported by the defendant's (1) joining in a group that got into a verbal and physical altercation with a man on the way to the riot, stopping only after officers physically separated them; (2) bringing his 14-year-old child into the Capitol during the riot; (3) entering the Capitol at approximately 2:19 p.m. through the Senate Wing Door, minutes after other rioters first broke open this door and shattered nearby windows during the initial breach of the Capitol; (4) joining the crowd that surged past police officers trying to hold back the rioters in the Crypt; (5) entering the suite of offices assigned to Speaker of the House Nancy Pelosi; (6) joining another crowd attempting to enter the House Chamber while lawmakers were still trapped inside, and encouraging other rioters to break the door down; (7) continuing to participate in the riot, and using vulgar language to taunt police, despite witnessing the violence against officers; (8) minimizing his conduct to the FBI when interviewed; and (9) having prior involvement in the criminal justice system.

---

[2] Despite his conviction for Obstruction of an Official Proceeding, in violation of Title 18, United States Code, § 1512(c)(2) and (2), in light of the Supreme Court's decision in *Fischer v. United States*, 603 U.S. ___ (2024), and after careful review and consideration of the facts and circumstances of this particular case, the government moved to dismiss the 18 U.S.C. § 1512(c)(2) count in this matter, which the Court granted. This dismissal, however, does not change the conduct for which the defendant was convicted or affect the aggravating factors discussed herein.

The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Spencer's crime support a sentence of twelve months of incarceration in this case.

## II.     Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* Dkt. No. 121.

### *Defendant Spencer's Role in the January 6, 2021 Attack on the Capitol*

On January 6, 2021, Spencer, his wife, Jenny Spencer, and their 14-year-old minor child, traveled to Washington, D.C. from their home in North Carolina to attend the "Stop the Steal" rally.

Once in Washington, D.C., they attended the rally where then-President Trump spoke and then marched to the Capitol.  As the Spencers walked toward the Capitol, they joined a group of individuals in tactical gear who were chanting "Fuck Antifa!"[3] They then joined a smaller group that aggressively confronted a "counter-protestor" who was expressing disagreement with

---

[3] Open-source video from January 6 depicts this group and their chant and they can be identified as the Proud Boys.  The Proud Boys is a nationalist organization with multiple U.S. chapters and potential activity in other Western countries.  The group describes itself as a "pro-Western fraternal organization for men who refuse to apologize for creating the modern world; aka Western Chauvinists."  Proud Boys members routinely attend rallies, protests and other First Amendment-protected events, where certain members sometimes engage in acts of violence against individuals whom they perceive as threats to their values.  The group has an initiation process for new members, which includes the taking of an "oath."  Proud Boys members often wear the colors yellow and black, as well as other apparel adorned with Proud Boys-related logos and emblems. Multiple members of the Proud Boys have been arrested for their participation in the January 6 riot at the Capitol.

marchers.  Specifically, with his child next to him, the defendant yelled, "Easy to talk shit behind the cops!"  His wife yelled, "Look who's protecting you…(indiscernible) behind the fuckin' police!"  D.C. Metro Police ("MPD") had to physically intervene to stop the encounter from becoming violent.

Upon approaching the Capitol building, the defendant observed people climbing scaffolding and walls and saw police arrest at least one individual. The defendant later admitted he also saw police shooting pepper balls and recognized that what was happening was wrong. Undeterred by these observations, he and his wife pressed forward with their child in tow. The Spencers climbed the northwest stairs near the inauguration stage, bringing them to the northwest courtyard at approximately 2:17 p.m.  The Spencers entered the Capitol building through the Senate Wing Door at approximately 2:19 p.m., about six minutes after the initial breach of the building.

Once inside, they lingered briefly in the northwest corridor and then turned right, proceeding into the Crypt.  There, U.S. Capitol Police had formed a line of officers blocking the rioters from advancing further into the building.  As the police tried to hold the crowd back, the defendant livestreamed on Facebook, taking pride in his participation in the riot: "Wooh! We in this motherfucker!" and "Bro, they just stormed the Capitol, bro. Pushed the cops out of the way, everything. Took it over."

Rioters continued streaming into the Crypt, quickly outnumbering the officers, and pushing past them. The Spencers formed part of this critical mass, and as the crowd moved forward over the helpless police officers, the defendant yelled "Don't stop!"

The Spencers moved past the police into the Small House Rotunda and took the stairwell south of the Crypt to the second floor of the Capitol. They then briefly entered the Speaker's office

suite before turning around. This whole time, defendant was continuing to broadcast his conduct in a Facebook Live video. While in the suite, the defendant asked, "Where's Nancy's office?" Of note, Speaker Pelosi had staff members who were trapped inside a room in that suite as the rioters called for Speaker Pelosi steps away from them.

The Spencers left Speaker Pelosi's office suite and proceeded across Statuary Hall. There, continuing to film, the defendant stated, "Who would've knew (sic) the first time I ever come (sic) would be to storm?" referencing his presence in the Capitol that day.

Once through the Statuary Hall Connector, the Spencers joined yet another group of rioters outside the House Chamber that was trying to break into the Chamber while members of Congress were sheltering in place.  Defendant remained in this mob for approximately nine minutes, as the rioters chanted "Break it down!" (in reference to the House Chamber door). Defendant encouraged the violent mob by yelling, "Kick that motherfucker open!"

After tear gas was deployed near the House Chamber entrance, the Spencers moved past a stairwell and into a hallway to the east of the House Chamber. There, they again lingered while alarms blared despite being steps away from the exit. As they lingered there, a group of officers attempting to move down the hallway were attacked by a rioter. The defendant joined the attacking group of rioters, taunting police with shouts of "Smile motherfucker!  Smile bitch!" while other rioters bowled furniture at the officers, which they had to dodge in order to move. This despite the Spencers having a clear view of the exit.  Approximately three minutes after he first entered the small hallway near the exit and after the officers had gotten past the rioters, the Spencers finally exited onto the balcony.

In total, the defendant spent just over 30 minutes inside of the Capitol, during which time he consistently livestreamed video. He did all of this with his minor child in tow.

*Defendant's Interview*

Two weeks after the attack on the Capitol, the defendant agreed to be interviewed by the FBI. Though the defendant admitted entering the Capitol, he minimized his involvement in the riot. Specifically, the defendant falsely claimed the police were present at the entrances to the Capitol but not stopping anyone from going in. Similarly, the defendant falsely claimed that he didn't understand why police employed tear gas. Even when presented with his recorded statements, he denied making them, except for one instance in which he called the police "traitors."

*The Charges and Plea Agreement*

On March 10, 2021, a grand jury indicted Spencer in a five-count indictment for Obstruction of an Official Proceeding, in violation of Title 18, United States Code, § 1512(c)(2) and (2); Entering and Remaining in a Restricted Building, in violation of Title 18, United States Code, § 1752(a)(1); Disorderly and Disruptive Conduct in a Restricted Building, in violation of Title 18, United States Code, § 1752(a)(2); Disorderly Conduct in a Capitol Building, in violation of Title 40, United States Code, § 5104(e)(2)(D); and Parading, Demonstrating, or Picketing in a Capitol Building, in violation of Title 40, United States Code, § 5104(e)(2)(G). On February 21, 2024, the Court found Spencer guilty of all counts of the Indictment following a stipulated trial.

## III.   Statutory Penalties

Spencer now faces a sentencing for violating four criminal statutes, including Entering and Remaining in a Restricted Building, in violation of Title 18, United States Code, § 1752(a)(1); Disorderly and Disruptive Conduct in a Restricted Building, in violation of Title 18, United States Code, § 1752(a)(2); Disorderly Conduct in a Capitol Building, in violation of Title 40, United States Code, § 5104(e)(2)(D); and Parading, Demonstrating, or Picketing in a Capitol Building, in violation of Title 40, United States Code,  § 5104(e)(2)(G).

As noted by the U.S. Probation Office, on Counts Two and Three, the defendant faces up to one year imprisonment and a fine of up to $100,000. On Counts Four and Five, the defendant faces up to six months of imprisonment and a fine of up to $5,000. As the offenses in Counts Four and Five are Class B Misdemeanors, the Sentencing Guidelines do not apply to them. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

## IV.    The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

In light of the dismissal of Count One of the Indictment, the government submits the Sentencing Guidelines calculation for Counts Two and Three should be:

**Count Two**
Base Offense Level (U.S.S.G. §2B2.3(a))                                              +4
Specific Offense Characteristics (U.S.S.G. §2B2.3(b)(1)(A))[4]          +2
Total Adjusted Offense Level                                                          4

**Count Three**
Base Offense Level (U.S.S.G. §2A2.4(a))                                          +10
Acceptance of Responsibility (USSG §3E1.1(a))                                 -2

---

[4] As indicated in the Statement of Facts for Stipulated Trial, the specific offense characteristic applies because the trespass occurred "at any restricted building or grounds" under U.S.S.G. §2B2.3(b)(1)(A)(vii). ECF No. 121 at 4. On January 6, 2021, the U.S. Capitol was restricted because protectees of the United States Secret Service were visiting. *See* 18 U.S.C. § 1752(c)(1)(B).

Total Adjusted Offense Level                                    10

The government submits that the defendant's convictions under Counts 2 and 3 are grouped under U.S.S.G. § 3D1.2(a).

The U.S. Probation Office calculated Spencer's criminal history as a category III. PSR at ¶ 60. Accordingly, Spencer's total adjusted offense level, after acceptance, is 8 and his corresponding Guidelines imprisonment range is 6-12 months.

## V.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this case, the Court must also be guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Under the facts of this specific case, as described below, the Section 3553(a) factors all weigh in favor of a sentence at the top of the guidelines range calculated by the government. At the same time, it is important to recognize that an upward departure and/or variance in this case would not be inappropriate because the defendant's Guidelines range does not adequately capture the unprecedented and uniquely harmful nature of his crimes, which struck at the heart of our democracy and the rule of law.[5] While the government has chosen not to proceed forward with litigating the scope of §1512(c)(2) in this case, it is appropriate to note that the defendant nonetheless possessed corrupt intent to interfere with a congressional proceeding, let alone a proceeding designed – by the Constitution and federal law – to ensure the peaceful transfer of power between one administration to the next.

---

[5] The D.C. Circuit's holding in *United States v. Brock*, 94 F.4th 39 (D.C. Cir. 2024) finding that certain sentencing enhancements did not apply to the Congress's counting and certification of the electoral college votes, despite acknowledging that interference with this process "no doubt endanger[ed] our democratic process and temporarily derail[ed] Congress's constitutional work" demonstrates that the Sentencing Commission failed to anticipate anything like the January 6 riot when drafting the Guidelines. And the Supreme Court's recent decision in *United States v. Fischer*, 144 S. Ct. 2176 (2024) demonstrates that the criminal code lacks the appropriate tools to fully address the crimes of January 6. *See Fischer*, slip op. at 29 (Barrett, J., dissenting) ("Who could blame Congress for [its] failure of imagination?").

The defendant was an avid and willing participant in an unprecedented crime. He joined a mob that threatened the lives of legislators and their staff, interrupted of the certification of the 2020 Electoral College vote count, injured more than one hundred police officers and resulted in more than 2.9 million dollars in losses. His offense targeted the peaceful transfer of power, an essential government function, and one of the fundamental and foundational principles of our democracy. Like every member of the mob, Spencer "endanger[ed] our democratic processes and temporarily derail[ed] Congress's constitutional work." *United States v. Brock*, 94 F.4th 39, 59 (D.C. Cir. 2024). As Judge McFadden put it to another rioter, "[Y]ou and your fellow rioters were responsible for substantially interfering with the certification, causing a multiple-hour delay, numerous law enforcement injuries and the expenditure of extensive resources." *United States v. Hale-Cusanelli*, 21-cr-37 (TNM), Sent'g Tr. 9/22/22 at 86-87.

But nothing in this defendant's Guidelines calculation reflects these facts. The defendant would face the same offense level if his crime(s) had not endangered the democratic process or interfered with the peaceful transfer of power.  There is no specific offense characteristic in the Guidelines for attacking democracy or abandoning the rule of law. "And simply saying, yeah, I know I trespassed, I trespassed, that's not really capturing the impact of what that day meant when all of those members of Congress met there to fulfill their constitutional duty." United States v. Calhoun, 21-CR-116-DLF, Sent. Tr. at 85. So a while a sentence within the defendant's Guidelines range here may "reflect the seriousness of the offense," "promote respect for the law," or "provide just punishment for the offense", the government nonetheless recognizes that other cases involving §1512(c)(2) conduct may warrant more severe treatment. 18 U.S.C. § 3553(a)(2)(A); *see also*

U.S.S.G. § 5K2.7[6] (noting that a departure may be warranted when an offense results in a "significant disruption of a governmental function").

It is not hyperbole to call what happened on January 6 a crime of historic magnitude. As judges of this district have repeatedly and clearly stated, January 6 was an unprecedented disruption of the nation's most sacred function—conducing the peaceful transfer of power "The events that occurred at the Capitol on January 6th will be in the history books that our children read, our children's children read and their children's children read. It's part of the history of this nation, and it's a stain on the history of this nation." *United States v. Miller*, 21-CR-75-RDM, Sent. Tr., at 67. But just as the history books will describe the crimes of January 6, so will they tell the story of how this nation responded. Future generations will rightly ask what this generation did to prevent another such attack from occurring. The damage done to this country on January 6 must be reflected in the sentences imposed on those who caused the damage—it must not be treated as just another crime.

- "January 6th wasn't an ordinary violent riot but one that interfered with the counting of electoral votes and the peaceful transition of power, which is one of the bedrocks of our democracy." *United States v. Perkins*, 21-CR-147-CJN, Sent. Tr. at 53.

- *United States v. Wyatt*, 23-CR-215-RDM, Sent. Tr. at 44. "The security breach forced lawmakers to hide inside the House gallery until they could be evacuated to undisclosed locations. In short, the rioters' actions threatened the peaceful transfer of power, a direct attack on our nation's democracy." *United States v. Fitzsimons*,

---

[6] This guideline does not require the government to establish a direct link between the defendant's misconduct and the alleged disruption, nor does it "require that the disruption be of any particular type or consequence." *See United States v. Saani*, 650 F.3d 761, 765–66, 771 (D.C. Cir. 2011).

21-CR-158-RC, Sent. Tr., at 85-86.

Indeed, judges of this Court have also appropriately applied departures when warranted. *See United States v. Eicher*, 22-cr-38 (BAH), Sent. Tr. 9/15/23 at 50 (applying § 5K2.7 because the defendant "join[ed] a mob, in the center of the melee, and through the sheer numbers and aggressive conduct towards police, breached the Capitol resulting in stopping the legitimate business of Congress for hours"); *United States v. Black*, 21-CR127-ABJ, Sent. Tr. 5/16/23 at 27 (applying an upward departure pursuant to § 5K2.7 for a January 6 rioter). Because the seriousness of defendant's crime is not adequately captured by the applicable Guideline, an upward departure under § 5K2.7 is appropriate. Similarly, a court may also elect to vary upwards outside of the guidelines analysis. As the Circuit has held, an upward variance is appropriate when "the defendant's conduct was more harmful or egregious than the typical case represented by the relevant Sentencing Guidelines range." *United States v. Murray*, 897 F.3d 298, 308–09 (D.C. Cir. 2018) (cleaned up). While the Supreme Court's decision in *Fischer* has impacted the counts of conviction in this case, "*Fischer* does not dictate the Court's application of the 18 U.S.C. 3553(a) factors [because] the Court may still consider [defendant's] serious conduct on January 6th, 2021 in its entirety." *United States v. Hostetter*, 21-CR-392-RCL, ECF 507, at 4-5 (cleaned up).

In past sentencings, this court has made clear its view of how serious the riot on January 6 was. *See United States v. Griffith*, 21-CR-244-CKK, Sent. Tr. at 53 ("Our democracy is fragile. And violence is an unacceptable way to resolve political differences. You're entitled to your political views. You can protest about them, but you cannot participate in an insurrection."). Those were not merely empty words—they were a recognition of the seriousness and unprecedented nature of the riot. If we are to prevent another January 6 and restore respect for the rule of law, sentences in these cases must send a message, and that message will not be conveyed by treating

the January 6 riot as a run-of-the-mill offense.

Here, the government devotes the preceding paragraphs to showcase that while this case may not necessarily warrant an upward variance or departure, the backdrop of January 6 nonetheless warrants exacting review of each defendant's conduct and crimes, but an appreciation of the overall danger of what happened that day. And in this case, the government's ultimate recommendation within the guidelines is not only fair, but should represent the floor, not the ceiling. In light of the aggravating factors that exist in this prosecution, the government's request is plainly reasonable.

### A. The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Spencer's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for defendants like Spencer, the absence of violent or destructive acts is not a mitigating factor. Had Spencer engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors in Spencer's case is his bombast throughout his time in the Capitol. He celebrated the riot ("Wooh! We in this motherfucker!); he jubilantly described what happened ("Bro, they just stormed the Capitol, bro. Pushed the cops out of the way, everything. Took it over."); he encouraged rioters to run over police in the Crypt ("Don't stop!"); he invigorated rioters trying to gain access to the House Chamber, wherein members of Congress

were sheltering ("Kick that motherfucker open!"); he taunted police who were being physically confronted by other rioters ("Smile motherfucker! Smile bitch!"). And he committed all the actions described above with his minor child in tow.

Accordingly, the nature and the circumstances of this offense establish the clear need for a substantial sentence.

### B.  Spencer's History and Characteristics

As set forth in the PSR, Spencer's criminal history consists of felony convictions between 2010 and 2015 for Obtaining Property by False Pretense, First Degree Trespass, Breaking and Entering and Possessing Burglary Tools for which he has spent varying time in jail and on probation. ECF 129 ¶¶ 56-58. But for the limitations of U.S.S.G. § 4A1.1(c), Spencer would have even more than the four criminal history points he has been assigned.

The defendant has struggled with narcotics addiction in the past but has been compliant while on pre-trial release. He has also maintained steady employment.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

### General Deterrence

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

### Specific Deterrence

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a term of incarceration.

First, as discussed above, Spencer's criminal history category of III, in conjunction with his history of prior arrests and convictions, reveals a clear pattern of disrespect for the law. *See* Section V(B) *supra.* Spencer's prior experiences with the criminal justice system, which included sentences of jail and probation, did not deter him from committing more crimes on January 6.

Second, although Spencer accepted responsibility by stipulating to all the facts underlying his guilt and resolving his cases via a bench trial, his post-January 6 conduct and statements are

troubling. Spencer has never expressed remorse for his conduct on January 6, 2021, and he lied to the FBI when trying to minimize his conduct. Spencer's lack of remorse indicates that he does not appreciate why his participation in the riot was wrong and poses a specific deterrence concern. The Court should thus view any remorse Spencer expresses at sentencing with skepticism at best. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).

The Court must sentence Spencer in a manner sufficient to deter him specifically, and others generally, from going down that road again.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers.[7] This Court must sentence Spencer based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.

---

[7] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Jesus Rivera*, 21-cr-60 (CKK), the defendant was convicted after a (non-stipulated) bench trial before this Court of Entering and Remaining in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(1); Disorderly and Disruptive Conduct in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(2); Violent Entry and Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); and Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). Like Spencer, Rivera encouraged other rioters with his words; entered the Capitol near the Senate Wing Door; spent approximately 20 minutes inside the Capitol; was present in the Crypt and live-streamed the riot while celebrating his participation. This Court sentenced Rivera to 8 months' incarceration on Counts One and Two, and 6 months' incarceration on Counts Three and Four, with one year of supervised release.

But Rivera's conduct is simply not in the same ballpark as Spencer's. Spencer was appropriately indicted – before *Fischer* – with having corrupt intent to interfere with the proceeding, a distinctly different gloss than the misdemeanors Rivera faced. Indeed, the defendant outwardly encouraged other rioters to engage in violent behavior and did so with his child present. *See United States v. Kyle Young*, 21-cr-291-ABJ, Sent. Tr., at 58 (sixteen-year-old child was considered an aggravating factor at sentencing for January 6 assault).

In *United States v. James Douglas Rahm, Jr.,* 21-cr-150 (TJH), the defendant was convicted after a stipulated trial of Obstruction of an Official Proceeding, in violation of Title 18, United States Code, § 1512(c)(2) and (2); Entering and Remaining in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(1); Disorderly and Disruptive Conduct in a Restricted Building,

in violation of 18 U.S.C. § 1752(a)(2); Violent Entry and Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); and Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). Rahm, Jr. also filmed himself inside the Capitol, used social media to promote and celebrate the riot, and minimized his conduct to the FBI. Rahm, Jr. was sentenced to 12 months imprisonment and three years post release supervision on his conviction for 18 U.S.C. § 1512 and 12 months imprisonment and one year post release supervision on each of his convictions for 18 U.S.C. § 1752.

This Court sentenced Mrs. Spencer to three months' imprisonment following her guilty plea to the Class B misdemeanor of Parading, Demonstrating or Picketing in the Capitol. *See* 21-cr-147-2 (CKK). The Spencers travelled through the Capitol together and each is responsible for bringing along their minor child. The salient difference in the case is while Mrs. Spencer was remarkably quiet in the Capitol, the defendant was clearly leading the family charge—he was boisterous and encouraging of criminal behavior, and possessed a greater level of harmful intent. Further, the defendant has a more extensive criminal history than his wife, who only had a prior misdemeanor conviction.

While §3553(a)(6) generally looks to counts of conviction, the basis of avoiding such disparities is also based on defendants with "similar records who have been found guilty of similar *conduct*". Thus, it is thus appropriate to look to similar conduct and sentencing in the context of prior §1512(c)(2) convictions. *See my note above about possible comparators.*

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the

result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## VI.    Restitution

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C.  § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). Because Spencer was

convicted of a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[8]

Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for [his or her] individual contribution to the

---

[8] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment."). *cf.* 18 U.S.C. § 3664(h) ("If the court finds that more than 1 defendant has contributed to the loss of a victim, the court … may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.").

More specifically, the Court should require Spencer to pay $500 in restitution for his convictions on Counts Two through Five. This amount fairly reflects Spencer's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, five hundred dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was convicted of only misdemeanors and not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VII.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Christopher Spencer to twelve

months of imprisonment, one year supervised release and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Spencer's liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     s/ *Douglas G. Collyer*
        Assistant United States Attorney
        Capitol Riot Detailee
        NDNY Bar No.: 519096
        14 Durkee Street, Suite 340
        Plattsburgh, NY 12901
        (518) 314-7800
        Douglas.Collyer@usdoj.gov